## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| RACHEL M. KRAMER and CLAIRE E. KRAMER, | ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) | Case No. 19-cv-3247 |
| ROBERT M. KOELLER, individually, and in his capacity as Successor Trustee of the REVOCABLE TRUST AGREEMENT of BARBARA K. KRAMER a/k/a BARBARA J. KRAMER, | ) ) ) ) ) ) ) ) ) | |
| Respondent. | ) | |

## OPINION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

This matter comes before the Court on Respondent Robert M. Koeller's Motion for Summary Judgment (d/e 67) (Motion).  The parties consented to proceed before this Court.  Consent to the Exercise of Jurisdiction by a United States Magistrate Judge and Reference Order entered February 20, 2020 (d/e 15).

Barbara Kramer died on November 11, 2018.  She was not married at the time and she had two adult surviving children, Petitioners Rachel Kramer and Claire Kramer (collectively the Daughters).  Barbara Kramer

also had a surviving brother Respondent Robert Koeller (Koeller). Koeller is a licensed attorney and lives and practices in Indianapolis, Indiana. On October 8, 2012, Barbara Kramer executed a will (2012 Will) and the Revocable Trust Agreement of Barbara K. Kramer a/k/a Barbara J. Kramer (Trust). The 2012 Will directed that the residuary of Barbara Kramer's estate should be distributed to the Trust. The Trust provided that the trust corpus should be divided one-half to Koeller and one-fourth to each of the Daughters.

The Daughters brought this action in Macoupin County, Illinois, Circuit Court to revoke the 2012 Will and Trust alleging that Koeller exerted undue influence over Barbara Kramer in order to receive half of the Trust. Notice of Removal (d/e 1); attached Amended Complaint to Declare Void and Set Aside Revocable Trust Agreement of Barbara K. Kramer a/k/a Barbara J. Kramer and Last Will and Testament of Barbara K. Kramer (Amended Complaint). Koeller removed the action to this Court based on diversity removal jurisdiction. Notice of Removal. Koeller denies that he exerted any undue influence over Barbara Kramer, and further, filed counterclaims against the Daughters. The first counterclaim alleged that Rachel Kramer violated the Illinois Disposition of Remains Act, 755 ILCS 65/1 et seq., because she took possession the cremated remains of

Barbara Kramer.  Koeller alleges that as executor of Barbara Kramer's

estate, he was entitled to determine the disposition of Barbara Kramer's

remains.  Respondent's Counterclaims (d/e 19), Counterclaim I; See 755

ILCS 65/5 and 65/50.  Koeller now asks for summary judgment on the

Daughter's claims and on Counterclaim I.  The Respondent does not seek

summary judgment on his Counterclaims II, III, and IV.  The Daughters

oppose the Motion. For the reasons set forth below, the Motion is

ALLOWED in part and DENIED in part.

STATEMENT OF FACTS

Barbara Kramer moved to Bunker Hill, Illinois, in 1972.  Motion,

attached Deposition of Rachel Kramer (d/e 68 and 69) (Rachel Kramer

Deposition), at 116. In 1983, she and her husband divorced.  Her husband

had a Small Business Administration (SBA) loan (SBA Loan) for his

business and after the divorce, the SBA sought to collect the SBA Loan

from Barbara Kramer.  Koeller wrote a letter on his attorney letterhead to

the attorney who represented the ex-husband complaining that Barbara

Kramer was not supposed to be responsible for that debt.  Koeller

Deposition Exhibits (d/e 70, 71, and 72), Exhibit 29, Letter dated January 7,

1985 from Koeller to attorney Connie Matthews, Esquire (d/e 72, at 41 of

48).[1]  Koeller also found an attorney for Barbara Kramer to represent her with the SBA and that attorney secured Barbara Kramer's release from any obligation for the SBA Loan.  Koeller Deposition, at 129-32.

In January 1995, Ruth Koeller, the mother of Koeller and Barbara Kramer, deeded a farm located in Pike County, Illinois, to Koeller and Barbara Kramer.  The Koeller family members referred to this farm as the East Farm.  Koeller Deposition, at 15-21.   Ruth Koeller also owned additional farmland in Pike County.  Koeller traveled to Pike County regularly in the 1990s to manage the family farmland, including the East Farm.  At some point, Koeller and Barbara Kramer sold the East Farm to the tenant.  Koeller Deposition, at 80; Koeller Deposition Exhibits, Exhibit 15-21, 30, Letter from Koeller to Ruth Koeller dated March 8, 1996 (d/e 72, at 43 of 48).

Ruth Koeller died in 2002.  Before her death, she asked Koeller to take care of his sister, Barbara Kramer.  Koeller testified that his relationship with Barbara Kramer improved and they became close after their mother died.  Koeller Deposition, at 114; Motion, attached Deposition of Mary Burns (Burns Deposition), at 19.

---

[1] The Court cites to the CM/ECF page number for the Koeller Deposition Group Exhibits).

Ruth Koeller left much of her estate to Koeller and Barbara Kramer, including stock and other securities.[2]  Koeller handled the process of dividing the securities into separate accounts for Barbara Kramer and himself.  Koeller and Barbara Kramer both maintained brokerage accounts at several brokerage firms and financial advisory firms (hereinafter financial advisors).  Koeller Deposition, at 91-93.  See.  Barbara Kramer asked Koeller for the names of the financial advisors he used, and Barbara Kramer often used the same ones.  Koeller Deposition, at 94; see Rachel Kramer Deposition, at 51-52 (Barbara Kramer sought out professional advice for the handling of her financial affairs.).

Barbara Kramer authorized her financial advisors to send Koeller copies of her investment account statements.  Koeller Deposition, at 93; see Koeller Deposition Exhibits, Exhibit 16, Letter dated April 27, 2009 from RBC Broker Cliff Greenlee to Decedent (d/e 71, at 17 of 80), and Exhibit 18, Decedent's RBC Account Statement for the period September 1, 2010 to September 30, 2010 (d/e 71, at 25-29 of 80).  Barbara Kramer put Koeller's name on her bank accounts and made at least one account payable on death to Koeller.  Rachel Kramer Deposition, at 150-51; Claire

---

[2] Ruth Koeller had one other child who died as a baby.  Koeller and Barbara Kramer were her only surviving children.  Rachel Kramer Deposition, at 209.

Koeller Deposition, at 77; Koeller Deposition Exhibits, Group Exhibit 11 and 12, United Community Bank of Bunker Hill Account Statements and Account Registers (d/e 70, at 51-62 of 62 and d/e 71, at 1-8 of 80).  Since the 1980s, Barbara Kramer authorized Koeller to have access to her safety deposit boxes.  Koeller Deposition, at 88; see Koeller Deposition Exhibits, Exhibit 14, Safety Deposit Box Advice Statement (d/e 71, at 15 of 80).

Koeller reviewed Barbara Kramer's investment account statements from her financial advisors.  Barbara Kramer's financial advisors sometimes spoke to Koeller about Barbara Kramer's accounts and Koeller passed along information from financial advisors to Barbara Kramer.  Koeller Deposition, at 94-95.  Barbara Kramer also spoke directly to her financial advisors about her accounts.  On occasion, Barbara Kramer asked Koeller a question about her holdings.  Koeller Deposition Exhibits, Group Exhibit 22, Emails and attachments between Koeller, Decedent, and Representatives of Brokerage and Investment Advisory Firms (d/e 71, at 49-59, 64-75 of 80, and d/e 72, at 9 of 48).  Barbara Kramer, however, did not give Koeller authority over her accounts.  Koeller Deposition, at 136; Motion, Exhibit A, Affidavit of Matthew Rice ¶ 4.

Barbara Kramer was diagnosed with cancer in 2002 after her mother died.  She lived with Koeller and his wife Marlene Koeller in Indianapolis for

five or six months while she underwent chemotherapy treatments. <u>Burns</u>
<u>Deposition</u>, at 20-21; <u>Rachel Kramer Deposition</u>, at 121; <u>Claire Kramer</u>
<u>Deposition</u>, at 75.  Thereafter, Barbara Kramer visited Koeller and Marlene
Koeller about once a year in Indianapolis and stayed for four to five days
during these visits.  <u>Koeller Deposition</u>, at 21-22; <u>Claire Kramer Deposition</u>,
at 98.

Rachel Kramer left home for college in 1979.  After completing her
education, she lived in Cincinnati, Ohio.  <u>Rachel Kramer Deposition</u>, at 95-
96.  Claire Kramer left home to go to college shortly after her parents'
divorce in 1983.  <u>Claire Kramer Deposition</u>, at 87-89.  In 2004, Claire
Kramer moved to Hamel, Illinois, but commuted to St. Louis to work.  <u>Claire</u>
<u>Kramer Deposition</u>, at 10-14, 17.

Claire Kramer has epilepsy, vision problems including pigmentary
dispersion and a detached retina, and deterioration of the cerebellum.  She
sometimes could not drive because of her epilepsy and had to get rides to
work in St. Louis during those times.  <u>Claire Kramer Deposition</u>, at 10-16.

Barbara Kramer told Rachel Kramer that she wanted to take care of
herself and support her Daughters, particularly Claire Kramer:

[Barbara Kramer] has told me many times that all she
wanted for Claire was the ability for her to stop working, and be
able to not have to drive to St. Louis because she has chronic
problems; and she wished that I didn't have to have 50 million

jobs, and wasn't so, you know, dependent on -- she said that
many times, and so she wanted for herself to not have to rely
on people, and wanted to support us.

Rachel Kramer Deposition, at 54; see Rachel Kramer Deposition, at 159.

The Daughters had no knowledge of the nature of Barbara Kramer's

relationship with Koeller.  Rachel Kramer Deposition, at 74-75; Claire

Kramer Deposition, at 72.

Rachel Kramer opined in her deposition that Koeller did not approve

of Rachel Kramer's sexual orientation:

> I believe that he was -- I believe that he is a bit of a racist
> homophobe, and I think that he influenced her for a time to
> have a negative reaction to me because I chose to be with a
> woman, and I think ironically she turned the page, and he didn't.
> She had a lot to say about how she had come to understand a
> much different way of thinking.
> . . . .
> In her very final moments she asked for my partner to speak to,
> the very last person she asked to speak to was Mary Lynn, not
> any member -- she is a member of the family, but it was her
> that she asked to speak to, and I believe that Robert and
> Marlene[3] both influenced her first way of thinking, and she
> didn't want to -- and she changed.

Rachel Kramer Deposition, at 140.

Rachel Kramer sometimes wanted to come to Indianapolis to see

Barbara Kramer when Barbara Kramer visited the Koellers, and on some of

those occasions, the Koellers would not allow Rachel Kramer to stay with

---

[3] Marlene was the wife of Robert Koeller.

them to visit with her mother.  Rachel Kramer also was not invited to a 50th

wedding anniversary party and a birthday party.  Rachel Kramer did not

identify the dates of these events, the person hosting these events, the

couple celebrating an anniversary, or the person celebrating a birthday.

Rachel Kramer also stated that the Koellers did not visit with her when they

came to Cincinnati.  The Koeller's daughter Kristin Koeller Sneider lived in

Cincinnati.  Rachel Kramer Deposition, at 41-42,143-44,169.

On July 10, 2002, Barbara Kramer executed a will (2002 Will) drafted

by attorney Dana Eastman of Alton, Illinois.  Sometime after July 10, 2002

and before September 7, 2012, Barbara Kramer asked Koeller to draft a

codicil (Draft Codicil) to the 2002 Will.[4]  Koeller did some estate planning in

his law practice.  Koeller Deposition, at 135.  The Draft Codicil bequeathed

Barbara Kramer's piano to Claire Kramer and two rings to Koeller's

daughter Kristin Koeller Sneider.  Koeller included the bequest to his

daughter Kristin Koeller Sneider because Barbara Kramer told him to do

so.  Koeller Deposition, at 30.  Barbara Kramer asked Claire Kramer if she

was interested in the rings.  Claire Kramer said she did not think so, but

Rachel Kramer might want them.  Claire Kramer Deposition, at 58; see

---

[4] Neither party has submitted the signed Codicil, and neither party cites any evidence of the date the
Codicil was signed.

Rachel Kramer Deposition, at 63-64. Rachel Kramer believed Koeller's wife Marlene Koeller exerted undue influence over Barbara Kramer to get her to leave the rings to the Koellers' daughter Kristin.  Rachel Kramer Deposition, at 66.  Rachel Kramer cited no evidence of anything Marlene Koeller did to influence Barbara Kramer.

The Draft Codicil also authorized the Daughters to select whatever musical pieces each desired from Barbara Kramer's music library.  The unsigned Draft Codicil left a blank for the recipient of the remainder of the music.  Barbara Kramer told Koeller she wanted to leave the music library to a college where a particular professor worked.  The Draft Codicil bequeathed the remainder of Barbara Kramer's household goods and other tangible personal property to the Daughters.  Motion, accompanying Koeller Deposition, at 26-31; Koeller Deposition Exhibits, Exhibit 3, Unsigned Copy of Draft Codicil (d/e 70, at 13 of 62).  Koeller retained the Draft Codicil on his computer.  Koeller Deposition, at 33.  Barbara Kramer executed the Codicil drafted by Koeller, but the record does not indicate the date that Barbara Kramer executed the Codicil and does not include a copy of the final, executed Codicil.  Deposition of Robert Koeller (d/e 68 and 69) (Koeller Deposition), at 25-27.

In 2004, Koeller referred Barbara Kramer to attorney Robert T. Dassow, who represented plaintiffs in a multi-district litigation against the manufacturers of the analgesic Vioxx.  Barbara Kramer participated in the Vioxx litigation as a plaintiff.  She had suffered a heart attack after taking Vioxx for arthritis pain.  Koeller Deposition, at 70-74.  On December 1, 2004, attorney Dassow sent a fee agreement to Koeller for Barbara Kramer to engage Dassow as her attorney.  On September 26, 2005, attorney Dassow sent Koeller a second fee agreement valid under New Jersey law because Dassow decided to file her claim in New Jersey.  Motion, Kramer Deposition, Deposition Group Exhibit E, Letters from Dassow to Koeller dated December 1, 2004 and September 26, 2005.

In 2008 or 2009, attorney Dassow secured a settlement of Barbara Kramer's claim in the Vioxx litigation.  Barbara Kramer's gross settlement was $450,408.00, and her net share after payment of expenses and attorney's fees was $288,827.59.  The undated breakdown of the payment of her settlement showed that Barbara Kramer received a partial payment of $121,571.98, representing of 40 percent of the net settlement, and a final payment of $167,255.61, representing the remaining 60 percent of the net settlement.  Barbara Kramer's handwritten savings account register indicates that she deposited the initial payment on or about June 28, 2008

or September 9, 2009.  The handwritten record contains these two dates written near the first deposit of the first payment.   Koeller Deposition Exhibits, Deposition Group Exhibit 12, Decedent's Savings Account Register (d/e 70 at 54 of 62).  Barbara Kramer received the final payment on or about December 2, 2009. The transmittal letter from attorney Dassow was dated December 2, 2009, and the savings account register shows a deposit of the final payment on December 4, 2009.  Id.  Koeller Deposition Exhibits, Deposition Group Exhibit 10, Letter from Dassow to Decedent dated December 2, 2009 (d/e 70, at 48 of 62).

The court approved an attorney's fee of 32 percent of Barbara Kramer's gross Vioxx settlement.  The fee was divided between the attorney Dassow's law firm, Koeller, and a firm identified as the Lanier Firm.  Koeller received $11,442.07 with the initial 40 percent payment to Barbara Kramer and $9,379.91 with the final payment, for a total of $20,821.98.  Koeller Deposition Exhibits, Deposition Group Exhibit 10, Settlement Distribution Receipts (d/e 70, at 49-50 of 62).  Koeller testified that attorney Dassow insisted on paying Koeller a 20 percent referral fee. Koeller Deposition, at 73-74.  Koeller stated in his deposition that he did not represent his sister in the Vioxx litigation.  Koeller, however, kept a file on his sister's participation in the litigation and also talked to and

corresponded with the attorneys handling the Vioxx litigation several times regarding Barbara Kramer's claim.  Koeller estimated that he spent over 100 hours on her participation in the Vioxx litigation, "[d]uring the five, seven, ten years, whatever it was that it took my sister to get a settlement from this litigation." <u>Koeller Deposition</u>, at 73-75.

Barbara Kramer did not talk to Rachel Kramer or Claire Kramer about the Vioxx settlement.  <u>Rachel Kramer Deposition</u>, at 94-95; <u>Claire Kramer Deposition</u>, at 86.

Sometime before October 8, 2012, Barbara Kramer and Koeller discussed changes to her estate plan.  Barbara Kramer and Koeller discussed location of keys, location of a lockbox, who might sell her home, and other matters.  Barbara told Koeller she intended to name him as executor of her estate and asked Koeller how to make things easier for him to handle her affairs.  Koeller told her that she could set up a revocable living trust.  If she did, Koeller could avoid the time and expense of opening a probate estate.  Koeller said that Barbara Kramer did not mention to whom she wanted her assets to pass at her death.  <u>Koeller Deposition</u>, at 25, 39-40, 48.  Koeller had drafted revocable living trusts in his law practice.  <u>Koeller Deposition</u>, at 24.

On September 7, 2012, Barbara Kramer met with attorney Mary Albert-Fritz of Brighton, Illinois, to prepare a new will.  No one accompanied Barbara Kramer when she went to attorney Albert-Fritz's office.  Motion, attached Deposition of Mary Albert-Fritz (Albert-Fritz Deposition), at 13. Koeller and attorney Albert-Fritz did not know each other.  Koeller Deposition, at 22-23; Albert-Fritz Deposition, at 59, 83.  Koeller did not provide any documents to Albert-Fritz.  Albert-Fritz Deposition, at 53. Rachel Kramer and Claire Kramer also did not know attorney Albert-Fritz. Rachel Kramer Deposition, at 55-56; Claire Kramer Deposition, at 62. Barbara Kramer completed an intake form for new client's when she arrived at Albert-Fritz's office and stated on the form that she came "for information about establishing a revocable trust."  Albert-Fritz Deposition, at 15 and Albert-Fritz Deposition Exhibits, Exhibit B, Intake Form and Attorney Albert-Fritz Notes (Albert-Fritz Notes) (d/e 67-9, at 16 of 46).

Barbara Kramer and attorney Albert-Fritz met by themselves without anyone else present.  Albert-Fritz Deposition, at 14.  According to attorney Albert-Fritz's notes, Barbara Kramer stated that her brother Koeller recommended a revocable living trust to her.  Albert-Fritz Notes (d/e 67-9 at 3 of 46).  Attorney Albert-Fritz also recommended a revocable living trust to Barbara Kramer.  Attorney Albert-Fritz usually recommended revocable

living trusts to avoid probate and the publicity of probate.  Albert-Fritz
Deposition, at 102-03, 114-15.  A person who established a revocable
living trust needed a will that provided that the residuary of her estate would
be distributed (or "pour over") to the trust (a "pour over will").  Albert-Fritz
Deposition, at 17.  The purpose of the trust would be "to take care of her
through disability and death."  Barbara Kramer stated that she wanted
Koeller to be the successor trustee.  Barbara Kramer told Albert-Fritz that
"the dispositive provision would be 50 percent to Bob Koeller, 25 percent to
Rachel, her daughter, and 25 percent to Claire, her daughter, she told me."
Albert-Fritz Deposition, at 17-18.

Attorney Albert-Fritz explained to Barbara Kramer that she would
need to transfer her assets to the trust or change the beneficiary
designations on certain accounts to provide that the account or the
proceeds of the account would transfer to the trust at death.  Albert-Fritz
Deposition, at 18-19.  Attorney Albert-Fritz also prepared powers of
attorney for Barbara Kramer as part of her estate plan.  Barbara Kramer
stated that she wanted Koeller to be the person to act as her power of
attorney and Claire Kramer to serve if Koeller did not.  Albert-Fritz
Deposition, at 19-20.

On October 5, 2012, Barbara Kramer and attorney Albert-Fritz again met by themselves at attorney Albert-Fritz's office.  Barbara Kramer mentioned at this time that she wanted two rings to go to her niece Kristen Koeller Sneider.  Albert-Fritz Deposition, at 25-26.

On October 8, 2012, Barbara Kramer executed the 2012 Will and the Trust at the offices of attorney Albert-Fritz.  Albert-Fritz Deposition, at 27. The 2012 Will tracked the bequests of personal property in the Draft Codicil.  The 2012 Will bequeathed Barbara Kramer's piano to Claire Kramer and the two rings to Kristin Koeller Sneider.  The Will authorized the Daughters to select whatever musical pieces each desired from Barbara Kramer's music library and then bequeathed the remainder of her music library to McKendree College.  The Will bequeathed the remainder of Barbara Kramer's household goods and other tangible personal property to the Daughters.  Barbara Kramer told Albert-Fritz that she wanted her personal property distributed in this way.  Albert-Fritz Deposition, at 33-34.

The 2012 Will residuary clause left the residue of the estate to the Trust.  The Will appointed Koeller as the Personal Representative of Barbara Kramer's estate.  If Koeller did not serve in that position, the Will named Koeller's wife Marlene Koeller as Personal Representative.  Albert-Fritz Deposition Exhibits, Deposition Exhibit F, Signed Copy of 2012 Will

(2012 Will).  Albert-Fritz asked Barbara Kramer to select a back-up

Personal Representative in case Koeller and Barbara Kramer "would be

smashed in a car together."  Barbara Kramer chose Koeller's wife Marlene

Koeller.  Albert-Fritz Deposition, at 34-35.  Albert-Fritz said Barbara Kramer

was very certain about her selection of Personal Representative:

> And I didn't -- you know, because she told me this is who
> she wanted, Bob as number one, Marlene as number two, I
> didn't even question, "Why aren't you naming the kids?" I didn't
> because she was so clear and unwavering about it.

Albert-Fritz Deposition, at 35.

The 2012 Will contained Article VII to address the possibility that

Barbara Kramer and a beneficiary may die very close in time:

ARTICLE VII

> If any beneficiary and I should die under such
> circumstances as would render it doubtful whether the
> beneficiary or I died first, then it shall be conclusively presumed
> for the purposes of this Will that said beneficiary predeceased
> me, except however, that my spouse shall be conclusively
> presumed to have survived me.

2012 Will, Article VII.  Attorney Albert-Fritz included this provision in all the

wills she prepared.  Attorney Albert-Fritz included the reference to a spouse

Albert-Fritz Deposition, at 72-74.  Rachel Kramer believed Barbara Kramer

would not have allowed her will to contain a reference to a spouse if she

read the will.  <u>Rachel Kramer Deposition</u>, at 65-66; <u>see</u> <u>Claire Kramer</u>

<u>Deposition</u>, at 67.

The 2012 Will distributed the residuary estate to the Trust.  The Trust

contained the dispositive provisions of Barbara Kramer's estate plan.  The

first sentence of the Trust named Barbara Kramer as the Settlor and

Trustee of the Trust:

> Trust Agreement made the 8th day of October, at
> Brighton, Illinois, between Barbara K. Kramer, the Settlor, and
> Barbara K. Kramer, also serving at the Original Trustee of this
> Agreement.

<u>Albert-Fritz Deposition Exhibits</u>, Deposition Exhibit D, <u>Trust</u>, Article II (d/e

67-9, at 20 of 46).

Article II of the Trust set forth Barbara Kramer's powers as Settlor to

revoke or amend the Trust and named the successor Trustee after Barbara

Kramer ceased to be the Trustee.  Article II provided:

**ARTICLE II**

> Settlor may, by signed instrument delivered to the
> Trustee, revoke this Agreement in whole or in part or amend it,
> but no amendment changing the powers, duties, or
> compensation of the Trustee shall be effective unless approved
> in writing by the Trustee.
>
> In the event Barbara K. Kramer dies, resigns, or is unable
> to serve, then Robert M. Koeller is designated as Successor
> Trustee of this trust.  If Robert M. Koeller dies, resigns, or is
> unable to serve, then I appoint Marlene M. Koeller as
> Successor Trustee of this Trust.

Albert-Fritz Deposition Exhibits, Deposition Exhibit D, Trust, Article II (d/e 67-9, at 20 of 46).  Attorney Albert-Fritz discussed Article II with Barbara Kramer.  The first paragraph of Article II was a standard provision in the revocable trusts that attorney Albert-Fritz prepared for her clients at the time.  Albert-Fritz Deposition, at 29.  Barbara Kramer was worried about someone attempting to take advantage of her if she became unable to handle her affairs.  Attorney Albert-Fritz told her that this paragraph addressed that situation:

Q. Did you talk to her about that [Article II paragraph 1]?

A. Yes.

Q. Okay. How come?

A. Because I guess she was worried about any kind of mental capacity disability where she could be talked into something by someone like a Fuller brush salesmen or Kirby vacuum salesman that showed up at her door. She didn't want to be able to make them beneficiaries of the trust or tear up her trust or anything like that without the safety valve of Bob approving any amendment or changes to the trust in writing. So this was her worry in a declining mental state.

Albert-Fritz Deposition, at 28-29.

Attorney Fritz-Albert and Barbara Kramer also discussed the remaining paragraph of Article II appointing Koeller as successor Trustee.  Barbara Kramer wanted Koeller as successor Trustee, or if he did not

serve, she wanted Marlene Koeller as successor Trustee.  <u>Albert-Fritz</u>

<u>Deposition</u>, at 17-17, 53.

Article V set forth the distribution of the Trust corpus:

**ARTICLE V**

After satisfaction of the Settlor's legal debts, obligations, federal and/or state inheritance taxes, personal income and fiduciary income taxes, then the Successor Trustee shall distribute the remaining balance held in the Trust as follows:

A. 50% to my brother, Robert M. Koeller;
B. 25% to my daughter, Rachel M. Kramer;
C. 25% to my daughter, Claire E. Kramer.

If either of my daughters fails to survive me, then the share said daughter would have received shall go to my brother, Robert M. Koeller.

In the event my brother, Robert M. Koeller, fails to survive me then the residue of my estate shall be divided equally between my daughter, Rachel K. Kramer, my daughter, Claire E. Kramer, and my sister-in-law, Marlene M. Koeller.

<u>Albert-Fritz Deposition Exhibits</u>, Deposition Exhibit D, <u>Trust</u>, <u>Article V (67-9,</u>

<u>at 22 of 46)</u>.  Attorney Albert-Fritz did not question Barbara Kramer's

division of her estate between Koeller and the Daughters because Barbara

Kramer was clear about her wishes:

I could tell that it was her wish. I mean, she stated it in that order. It wasn't 25 percent to my daughter, 25 percent to my other daughter, and 50 percent to Bob, or 30/30/30. It wasn't any such thing as that. It was Bob half, my girls half.

<u>Albert-Fritz Deposition</u>, at 83.

Barbara Kramer also executed powers of attorney for healthcare and for property on October 8, 2012.  Attorney Albert-Fritz included powers of attorney as part of an estate plan as part of her standard practice.   Barbara Kramer named Koeller as the holder of her powers of attorney and Claire Kramer as the successor should Koeller be unable to serve.  <u>Albert-Fritz Deposition</u>, at 38. The power of attorney for property would only be become effective if Barbara Kramer's treating physician declared in writing that she we disabled.  <u>Albert-Fritz Deposition Exhibits</u>, Exhibit H, <u>Statutory Short Form Power of Attorney for Property (Power of Attorney for Property)</u> ¶ 6 (d/e 67-9, at 42 of 46).

Albert-Fritz stated in her deposition that in her professional opinion, Barbara Kramer executed the 2012 Will, the Trust, and the powers of attorney as her free and voluntary act.  Albert-Fritz had no reason to believe that Barbara Kramer was under the undue influence of Koeller when she executed these documents.  <u>Albert-Fritz Deposition</u>, at 51. Rachel Kramer believed that Barbara Kramer was of sound mind at the time that she executed the 2012 Will and Trust.  <u>Rachel Kramer Deposition</u>, at 62, 184.  Claire Kramer agreed that Barbara Kramer signed the 2012 Will of her own free will.  <u>Claire Kramer Deposition</u>, at 68.

Albert-Fritz discussed in her deposition how Barbara Kramer explained her relationship with Koeller:

> Because Barbara told me that -- how close she was to her brother and that he had helped her through lots of toils in the past and he was the person that she confided in and discussed things with almost like how you would do with a husband, but he was just a male in her life that she trusted and respected.

Albert-Fritz Deposition, at 30.  Albert-Fritz further explained:

> I think it was more than just brother. I think she relied on his legal advice, his financial guidance. It just appeared to me that they were closer than the ordinary brother and sister.

Albert-Fritz Deposition, at 52.  Albert-Fritz did not get the impression that Koeller managed Barbara Kramer's finances:

> I don't know that he managed them. I feel from my talks with her that she managed them but with his guidance and his counsel.

Albert-Fritz Deposition, at 53.

The file of attorney Albert-Fritz was produced in discovery and included an unsigned draft will substantially similar to the 2012 Will. Attorney Albert-Fritz testified that she had not seen the document before. Albert-Fritz Deposition, at 63-64, 68.  Counsel for the Daughters also showed the document to Koeller at his deposition.  Koeller did not remember seeing the unsigned draft will before the deposition.  Koeller Deposition, at 35.  Koeller said that he could have drafted the document.

Koeller said that he did not know if he drafted the unsigned draft will.
Koeller Deposition, at 32.  Koeller did not have a copy of the unsigned draft
will in his records.  Koeller Deposition, at 34.

Barbara Kramer did not discuss the contents of 2012 Will and the
Trust with the Daughters.  Rachel Kramer Deposition, at 119-20; Claire
Kramer Deposition, at 31, 66, 70.  Claire Kramer did not know of any
discussion between Koeller and Barbara Kramer regarding 2012 Will and
Trust.  Claire Kramer Deposition, at 72.  The first time Koeller knew that
Barbara Kramer left him half the corpus of the Trust was when he first read
the 2012 Will and the Trust after they had been executed.  Koeller could
not remember when he first read the 2012 Will and the Trust.  Koeller
Deposition, at 48.

On or about October 18, 2012, Barbara Kramer called Koeller for help
transferring her bank accounts into the Trust.  Barbara Kramer had a
problem with her bank because the Trust had a federal tax ID number.  The
bank representatives typically used the settlor's Social Security Number on
a revocable living trust account.  Koeller called attorney Albert- Fritz for
Barbara Kramer to discuss the matter on October 18 and 29, 2012.  Albert-
Fritz did not take Koeller's calls.  Koeller Deposition Exhibits, Group Exhibit
7, Telephone Messages, (d/e 70, at 30 of 62); Albert-Fritz Deposition, at

45-46.  Albert-Fritz would not disclose the information about Barbara Kramer's estate plan to a third party, even a beneficiary under the estate plan.  Barbara Kramer came to Albert-Fritz's office in early November 2012, a few days after Koeller's second call.  At that time, Albert-Fritz called Koeller in Barbara Kramer's presence and with her permission.  Albert-Fritz Deposition, at 46-47.  This conversation was the only time Attorney Albert-Fritz and Koeller spoke to each other before this case was filed.  Albert-Fritz Deposition, at 83.

In September 2016, Barbara Kramer and Koeller discussed the possibility of selling her home and moving into a condominium.  Barbara Kramer told Koeller her current mortgage interest rate and the remaining balance on the mortgage debt.  Koeller told Barbara Kramer that she had a good interest rate on her current mortgage.  He also estimated how much she would receive from a sale of her home after commissions and paying off the remaining balance on the mortgage.  Koeller Deposition, at 104-05; Koeller Deposition Exhibits, Group Exhibit 20, Email exchange between Koeller and Decedent dated September 19-21, 2016 (d/e 71, at 34-35 of 80).

Also, in September 2016, Barbara Kramer and Koeller were both considering hiring a new financial advisor, Riverpoint Capital Management

for their accounts (Riverpoint).  On September 27, 2016 Koeller advised Barbara Kramer that she probably could not sell many of her holdings without incurring taxable capital gains.  Koeller Deposition Exhibits, Group Exhibit 22, Email dated September 27, 2016 (d/e 71, at 51 of 80).  On October 10, 2017, Koeller opined that Barbara Kramer's annuity account held two well-performing stock and bond funds, and "[t]he rest is invested in funds with very low returns."  Koeller suggested that Barbara Kramer talk to her financial advisor about this.  Koeller Deposition Exhibits, Group Exhibit 22, Email dated October 10, 2016 (d/e 71, at 52 of 80).  On October 24, 2016, Koeller advised Barbara Kramer that the only problem with her investment accounts was the performance of her annuity.  He suggested waiting until they both received a proposal from Riverpoint.  Koeller Deposition Exhibits, Group Exhibit 22, Email dated October 14, 2016 (d/e 71, at 64 of 80).  Koeller and Barbara Kramer received the proposal by Riverpoint in December 2016.  By January 2017, Koeller and Barbara Kramer moved all their accounts to Riverpoint for management.   Koeller Deposition Exhibits, Group Exhibit 22, Email dated January 26, 2017 (d/e 71, at 70 of 80).

When Barbara Kramer's health began to deteriorate significantly, she gave Koeller the original 2012 Will to keep in his safe.  Barbara Kramer had

given Koeller the original Trust a couple of years earlier.  <u>Koeller</u>

<u>Deposition</u>, at 37.  Koeller stated in his deposition that he did not discuss

the 2012 Will or the Trust with Barbara Kramer when she provided them to

him.  He just put the documents in his safe and he did not read the 2012

Will or Trust when Barbara Kramer gave them to him.  <u>Koeller Deposition</u>,

at 38-39, 41, 55.

On or about May 14-15, 2018, Barbara Kramer and Koeller discussed

Barbara Kramer's expenses.[5]  Barbara Kramer was concerned that she

was taking too much money out of her annuity.  She was worried about

whether she had enough money to pay for her care if she had to go into a

nursing home.  Koeller knew Barbara Kramer's financial situation because

she gave him access to her accounts.  Koeller made a list of her expenses

based on the information Barbara Kramer provided.  Koeller told Barbara

Kramer that the information was helpful in figuring out if she was taking too

much out of her annuity.  <u>See</u> <u>Koeller Deposition</u>, at 96-98.

In May and June 2018, Koeller and Barbara Kramer also looked into

whether she could lower her homeowner, automobile, and health insurance

costs.  Koeller suggested contacting an independent insurance agent to

---

[5] The evidence in the record does not indicate whether Barbara Kramer gave Koeller the original 2012 Will before or after the May 14, 2018 exchange.  Koeller, however, stated that Barbara Kramer was in declining health as of May 14, 2018.  <u>Koeller Deposition</u>, at 100-01.

see if Barbara Kramer could save money on her insurance.  Koeller agreed to send Barbara Kramer's insurance information to Koeller's agent to see if he could find lower cost insurance.  In June 2018, Koeller received quotes from his insurance agent for new insurance policies for Barbara Kramer. Koeller noted that the quotes would reduce Barbara Kramer's automobile insurance by about $200 but would not provide much savings on her homeowner's policy.  Koeller Deposition, at 97-103; Koeller Deposition Exhibits, Group Exhibit 19, Emails between Koeller and Barbara Kramer dated May 14, 2018 (d/e 71, at 30-33 of 80), and Group Exhibit 21, Emails between Koeller and Barbara Kramer dated May 15, 2018 and June 15, 2028 and Insurance Quotes (d/e 71, at 36-48 of 80).

In November 2018, Barbara Kramer was hospitalized in Springfield, Illinois.  On November 5, 2018, Rachel Kramer and Koeller drove together to see Barbara Kramer.  Rachel Kramer drove from her home in Cincinnati to Indianapolis, picked up Koeller, and the two of them drove together to Springfield.  Koeller Deposition, at 35-36; Rachel Kramer Deposition, at 23. Koeller told Rachel Kramer that her mother Barbara Kramer had plenty of money to pay for her own care.  Koeller told her that Barbara Kramer received a settlement in the Vioxx litigation, and he advised Barbara Kramer on what to do with the Vioxx settlement money.  Koeller told Rachel

Kramer that he recommended to Barbara Kramer that she establish a trust. Koeller told her that Barbara Kramer would call him to ask if she had enough money to buy things like a car or a computer and for permission to buy such items.  Koeller told Rachel Kramer that Barbara Kramer had established a revocable living trust.  Rachel Kramer Deposition, at 25, 68, 80, 90-91; see Claire Deposition, at 83-84.  Koeller did not recall discussing the contents of the Will or Trust, or Barbara Kramer's finances with Rachel Kramer during the car trip.  Koeller testified that he likely had seen contents of the 2012 Will before the car trip.  Koeller Deposition, at 37, 41-46.

While at the hospital, Koeller and Claire Kramer met with Barbara Kramer's pulmonologist.  The pulmonologist told them that Barbara Kramer did not have long to live.  The pulmonologist estimated that Barbara Kramer would not live more than six months.  Koeller Deposition, at 61.

Rachel Kramer contacted Barbara Kramer's banker in Bunker Hill while at the hospital.  Rachel Kramer then got Koeller in contact with the banker.   Koeller told the banker that he was the successor trustee of the Trust.  The banker suggested that Koeller get Barbara Kramer to resign so Koeller could sign checks for the Trust to pay Barbara Kramer's bills. Koeller Deposition, at 58-60, 68-69; Rachel Kramer Deposition, at 113-14, 184-87.

On November 6, 2018, Rachel Kramer went to Barbara Kramer's home in Bunker Hill, Illinois, to prepare for her mother's return to her home upon discharge from the hospital.  Koeller went back to Indianapolis.  On November 7, 2018, Barbara Kramer was discharged from the hospital and returned to her home in Bunker Hill, Illinois, under hospice care.  Rachel Kramer stayed with Barbara Kramer.  Shortly before or after Barbara Kramer returned home from the hospital, she told Rachel Kramer where copies of the 2012 Will and Trust were located in the home.  On November 6 or 7, 2018, Rachel Kramer read the 2012 Will and Trust for the first time. Rachel Kramer Deposition, at 21, 26-27, 41.

Upon Koeller's return to his office in Indianapolis, he prepared a resignation document for Barbara Kramer to resign as Trustee of the Trust. Koeller Deposition, at 56.

On or about November 10, 2018, Koeller, Marlene Koeller, Kristin Koeller Sneider, and Rachel Kramer's partner Mary Lynn Barber drove together to Barbara Kramer's home.[6]  Rachel Kramer was still with Barbara Kramer at Barbara Kramer's home.  On November 10, 2018, Barbara Kramer executed the resignation document prepared by Koeller, and

---

[6] Rachel Kramer later refers to Mary Lynn Barber as her wife.  See Rachel Kramer Deposition, at 41 (partner) 197 (wife).

Koeller became successor Trustee of the Trust.  Koeller Deposition, at 59-

60.  Barbara Kramer was lucid and talking on November 10, 2018.  Rachel

Kramer Deposition, at 41-43, 55, 111-12; Claire Kramer Deposition, at 62,

80.

Rachel Kramer viewed Barbara Kramer resigning as Trustee as a

"red flag."  Rachel Kramer Deposition, at 111.  She explained:

> Well, I thought it was redundant. I didn't understand the
> point. I just felt like what's the point of this unless he was
> ensuring because my mother still was lucid that there could be
> no change in her mind to what was going to go on.

Rachel Kramer Deposition, at 115.  Rachel Kramer believed Koeller

exerted undue influence over Barbara Kramer to sign the resignation.

Rachel Kramer Deposition, at 116.  Rachel Kramer cited no evidence for

this belief.

On November 11, 2018, Barbara Kramer died.  Rachel Kramer

Deposition, at 113.  Koeller and the Daughters took the two rings

mentioned in the 2012 Will off of Barbara Kramer's' fingers and gave them

to Kristin Koeller Sneider.  Rachel Kramer Deposition, at 33-34.  Koeller

told Claire Kramer that she would be receiving a piano.  Claire Kramer

Deposition, at 49.

After Barbara Kramer's death, Koeller told Rachel Kramer to arrange

for her remains to be taken to Kravanya Funeral Home. Barbara Kramer's

remains were cremated and the Daughters planned the memorial service for Barbara Kramer in consultation with Koeller.  The Daughters decided to hold the memorial service on December 8, 2018.  Koeller did not provide any input on the memorial service.  Rachel Kramer Deposition, at 16; Claire Kramer Deposition, at 22.

Koeller told the Daughters to empty Barbara Kramer's home so that it could be sold.  Claire Kramer Deposition, at 29.  Claire Kramer came to Barbara Kramer's home about a week after her death.  She met with Rachel Kramer to clean out the house.  She first saw copies of the 2012 Will and Trust at that time.  Claire Kramer Deposition, at 30.

According to Rachel Kramer, Koeller told the Daughters that they could have any tangible personal property in the home.  He told them that they could sell any of the remaining personal property, but he was entitled to half of the proceeds of such sales.  Rachel Kramer Deposition, at 108-10; see also Claire Kramer Deposition, at 30.  Rachel Kramer saw the claim that Koeller was entitled to half of the proceeds of the sale of personal property as "a red flag."  She decided to talk to an attorney about Barbara Kramer's estate.  Rachel Kramer Deposition, at 110.  Rachel Kramer spoke to an attorney about the estate on November 21, 2018. Rachel Kramer Deposition, at 191.

After the memorial service, Rachel Kramer and Koeller discussed the disposition of the remains.  They agreed that, in the spring, they would bury the remains in Barry, Illinois, next to Barbara Kramer's parents' graves. Rachel Kramer took the remains home with her after the memorial service because representatives of the funeral home handed them to her.  As of the date of Rachel Kramer's deposition, Rachel Kramer still had Barbara Kramer's remains at her home in Cincinnati, Ohio.  Rachel Kramer Deposition, at 13-14.

Rachel Kramer believed that Barbara Kramer would have given at least 50 percent of her estate to Claire Kramer to help her be able to stop working because of her physical problems.  Barbara Kramer spoke to Rachel Kramer often of her concern for her sister Claire Kramer.  Rachel Kramer Deposition, at 159.

<u>ANALYSIS</u>

Koeller moves for summary judgment on the Daughters' claim of undue influence and his counterclaim under the Illinois Disposition of Remains Act 755 ILCS 65/1.  At summary judgment, Koeller must present evidence that demonstrates the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  The Court must consider the evidence presented in the light most favorable to the

Daughters.  Any doubt as to the existence of a genuine issue for trial must

be resolved against Koeller.  Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 255 (1986).  Once Koeller has met his burden, the Daughters must

present evidence to show that issues of fact remain with respect to an

issue essential to their case, and on which they will bear the burden of

proof at trial.  Celotex Corp. v. Catrett, 477 U.S. at 322; Matsushita Elec.

Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In this

case, the Daughters have failed to present evidence to show that an issue

of fact exists on the undue influence claims, but the Daughters have

demonstrated that issues of fact exist with respect to the counterclaim

under the Illinois Disposition of Remains Act.

Undue Influence Claim

To prove undue influence in the execution of a will or trust, the

plaintiff must present evidence that the defendant used improper influence

to overwhelm the actual intent of the testator or settlor.  The Illinois

Supreme Court explained:

> [U]ndue influence which will invalidate a will is "any improper * *
> * urgency of persuasion whereby the will of a person is over-
> powered and he is induced to do or forbear an act which he
> would not do or would do if left to act freely.' [Citation.]"
> (Franciscan Sisters Health Care Corp. v. Dean (1983), 95 Ill.2d
> 452, 460, 69 Ill.Dec. 960, 448 N.E.2d 872.) To constitute undue
> influence, the influence "'must be of such a nature as to destroy
> the testator's freedom concerning the disposition of his estate

and render his will that of another.' [Citation.]" <u>Franciscan Sisters</u>, 95 Ill.2d at 460, 69 Ill.Dec. 960, 448 N.E.2d 872; <u>see also</u> <u>Swenson v. Wintercorn</u> (1968), 92 Ill.App.2d 88, 105, 234 N.E.2d 91.

<u>In re Estate of Hoover</u>, 155 Ill.2d 402, 615 N.E.2d 736, 740 (Ill. 1993).

Undue influence may be shown by evidence that is "wholly inferential and circumstantial."

[Evidence] of false or misleading representations concerning the character of another may be so connected with the execution of the will that the allegation that such misrepresentations were made to the testator may present triable fact questions on the issue of undue influence.

<u>Id.</u>  The plaintiff must present evidence that the undue influence was "operative and must have been felt at the time the will was executed, even though it could have been exerted at any time."  <u>In re Estate of Roeseler</u>, 287 Ill. App. 3d 1003, 1018, 679 N.E.2d 393, 404 (Ill. App. 1st Dist. 1997). The undue influence "must be specifically directed toward procuring the will in favor of a particular person or persons."  <u>Estate of Letsche</u>, 79 Ill.App.3d 643, 646, 392 N.E.2d 612, 614 (Ill. App. 3d Dist. 1979).

The plaintiff may raise a presumption of undue influence if she presents evidence,

(1) that a fiduciary relationship existed between the testator and a person who substantially benefits under the will; (2) that the primary beneficiaries were in a position to dominate and control the dependent testator; (3) that the testator reposed trust and confidence in such beneficiaries; and (4) that the beneficiaries

were instrumental in or participated in the procurement or
preparation of the will.

Roeseler, 679 N.E.2d at 404.  The existence of the fiduciary relationship

alone is insufficient to prove undue influence.  Herbolsheimer v.

Herbolsheimer, 46 Ill.App.3d 563, 566, 361 N.E.2d 134, 136 (Ill.App. 3[d]

Dist. 1977).

In this case, the Daughters have evidence that the dispositive terms

of the Trust were inconsistent with Barbara Kramer's statements to Rachel

Kramer.  Barbara Kramer stated that she wanted to take care of the

Daughters, especially Claire Kramer due to Claire Kramer's health

problems.  When viewed favorably to the Daughters, the evidence of

Barbara Kramer's statements to care for the Daughters could be

inconsistent with giving half her residuary corpus of the Trust to Koeller.

The Daughters also have evidence of a confidential relationship

between Barbara Kramer and Koeller.  A confidential relationship "involves

confidence and trust on one side and dominance and influence on the

other."  Carey Elec. Contracting, Inc. v. First Nat. Bank of Elgin, 74

Ill.App.3d 233, 237-38, 392 N.E.2d 759, 763 (Ill. App. 2[d] Dist. 1979).  In this

case, Barbara Kramer trusted and confided in Koeller.  She put his name

on her bank accounts and gave him access to her safety deposit box.  She

gave him access to all her investment accounts and asked his advice about

Page **35** of 51

selling her home and buying a condominium.  She asked him whether she
was taking too much money out of her annuity.  He advised her on these
matters and also advised her about her investments.  He received a fee
denominated as an attorney fee in the breakdown of Barbara Kramer's
settlement distribution in the Vioxx litigation.  When viewed favorably to the
Daughters, this evidence indicates he had an attorney-client relationship
with Barbara Kramer from 2004 to 2009.  Taken together, the Daughters
have presented ample evidence, when viewed favorably to them, to show a
confidential relationship between the Decedent Barbara Kramer and
Koeller.

The Daughters, however, have not presented evidence that Koeller
did anything to overpower the individual will of Barbara Kramer to force her
to execute the 2012 Will and the Trust.  The Daughters have presented no
evidence that Koeller attempted to persuade Barbara Kramer to leave him
half of her estate.  Koeller recommended a revocable trust, but no evidence
shows that Koeller and Barbara Kramer discussed the disposition of
Barbara Kramer's estate at that time.  The Daughters have no evidence
that Koeller participated in the procurement of the 2012 Will or Trust.  The
Daughters, thus, cannot raise a presumption of undue influence.  Roeseler,
679 N.E.2d at 404.  They have the burden to present evidence.

The Daughters have failed to present evidence of undue influence at the time of the execution of the 2012 Will and Trust.  Barbara Kramer met alone with attorney Albert-Fritz on three separate occasions.  Koeller was not involved in those meetings.  Koeller and Albert-Fritz did not know each other.  Albert-Fritz prepared the 2012 Will and Trust in accordance with Barbara Kramer's instructions.  Albert-Fritz believed Barbara Kramer signed the documents of her own free will.  Rachel Kramer conceded that Barbara Kramer was of sound mind when she executed the documents, and Claire Kramer agreed that Barbara Kramer executed the documents of her own free will.  There is no evidence that Koeller overpowered Barbara Kramer's will to get her to execute the 2012 Will and Trust.

The Daughters point to the fact that Koeller prepared a Codicil to Barbara Kramer's 2002 Will.  That Codicil was superseded by the 2012 Will and had no effect on the disposition of Barbara Kramer's estate.  The Draft Codicil did not contain any instructions regarding the residuary of Barbara Kramer's estate.  The draft Codicil, therefore, does not tend to show any information about Barbara Kramer's desires regarding the distribution of the residuary of her estate or any efforts by Koeller to affect Barbara Kramer's desires for her residuary estate at the time that she executed the 2012 Will and Trust.

The Daughters point to the fact that the terms of the Draft Codicil were consistent with the bequests of personal property in the 2012 Will. The Draft Codicil and the 2012 Will both showed that Barbara Kramer left her piano to Claire Kramer, two rings to Koeller's daughter Kristin Koeller Sneider, and her music library first to her Daughters and the rest to an unnamed recipient in the Draft Codicil and McKendree College in the 2012 Will.  Koeller testified that Barbara Kramer instructed him to prepare these bequests in the Draft Codicil and he followed her instructions.  Attorney Albert-Fritz testified that Barbara Kramer told her to include these bequests in the 2012 Will and she followed her instructions.  The Daughters present no evidence to the contrary.  The Daughters cite Claire Kramer's testimony that she told Barbara Kramer that she was not interested in the rings but said Rachel Kramer might be interested.  Claire Kramer's comment to Barbara Kramer is not evidence of Barbara Kramer's intent.  The Daughters present no evidence that Barbara Kramer had any intent to leave the rings to Rachel Kramer rather than her niece Kristin Koeller Sneider.

The Daughters argue that Barbara Kramer did not read the 2012 Will before she signed it because she would not have allowed a reference to a spouse in Article VII.  This observation may relate to the execution of the

2012 Will, but the Daughters do not challenge the efficacy of the execution of the 2012 Will.  They bring only a claim of undue influence.  Whether Barbara Kramer read the 2012 Will does not tend to prove undue influence by Koeller.  He was not involved in the execution of the 2012 Will.

Rachel Kramer testified that she believes Marlene Kramer exerted undue influence over Barbara Kramer to convince her to leave the two rings to her niece.  Rachel Kramer, however, presents no evidence.  Her belief is speculation, not evidence.

Rachel Kramer also found it suspicious that a witness to the 2012 Will, Jerry Coleman, lived in Newburgh, Indiana.    See Rachel Kramer Deposition, at 182-84.  Coleman was another client of attorney Albert-Fritz whom Albert-Fritz asked to serve as a witness.  Albert-Fritz Deposition, at 76-82.  Koeller, Coleman, and millions of other people lived in Indiana. Koeller lived 170 miles away from Newburgh in Indianapolis, Indiana.[7] Rachel Kramer's suspicions about the fact that Koeller and Coleman both lived in Indiana is not evidence of undue influence.

The Daughters make much of the fact that attorney Albert-Fritz had in her files an unsigned draft will that was very similar to the 2012 Will.  The

---

[7] The Court takes judicial notice that Newburgh, Indiana, is next to Evansville, Indiana, at the southern tip of Indiana and approximately 170 in driving distance from Indianapolis.

Daughters, however, have presented no evidence that Koeller had a connection to this document.  The document was in Attorney Albert-Fritz's file.  Attorney Albert-Fritz did not receive any documents from Koeller and had no communications with Koeller until after Barbara Kramer signed the 2012 Will and Trust.  Attorneys Albert-Fritz and Koeller had no memory of the document.  Koeller conceded that he could have written the document, but he did not know.  Koeller's lack of knowledge is not evidence.  The Daughters have no evidence to tie Koeller to this document.  This document, therefore, lacks foundation and is not competent evidence.

As noted above, the evidence shows that Rachel Kramer and Claire Kramer believed Barbara Kramer was of sound mind when she executed the 2012 Will and Trust.  Attorney Albert-Fritz said that Koeller provided no documents to her.  There is no evidence that the draft will was reviewed by Attorney Albert-Fritz or Barbara Kramer when the 2012 Will and Trust was prepared.  The Trust, not the Will, directed the distribution of the residue of the estate 50% to Koeller and 25% to each of the Daughters. The Will only disposed of personal property, specifically, a piano, the two rings, Kramer's music library, household goods and other tangible personal property.  All of the personal property, other than the two rings, went to the Daughters or McKendree College.  There is no evidence that the Will in Attorney Albert-

Fritz's file shows undue influence by Koeller on the distribution of the residuary estate of Barbara Kramer.

Rachel Kramer opined in her deposition that Koeller was "a bit of a racist homophobe."   She believed Koeller and Marlene Koeller tried to turn Barbara Kramer against her, but ultimately failed.  Again, the Daughters' beliefs and surmises are not evidence.  Rachel Kramer presents no evidence that Koeller or Marlene Koeller ever said anything negative about her to Barbara Kramer.  Rachel Kramer said that sometimes the Koellers would not let her stay in their home in Indianapolis to visit with Barbara Kramer when Barbara Kramer was staying there.  Rachel Kramer presents no evidence that the Koellers did not let her come because of her sexual orientation or said anything to Barbara Kramer about Rachel Kramer's sexual orientation.  Rachel Kramer's testimony also means that sometimes they let Rachel Kramer stay in their home.  Rachel Kramer's beliefs, standing alone, are not evidence.

Rachel Kramer stated that she was not invited to a 50th wedding anniversary party or to a birthday party.  Rachel Kramer does not identify the dates of these parties, the hosts of these parties, the location of these parties, or the persons honored at these parties.  Rachel Kramer, therefore, has presented no evidence that the lack of an invitation to these events

shows any hostility toward her by the Koellers or any effort to turn Barbara Kramer against her.

Rachel Kramer also stated that the Koellers did not visit with her when they came to Cincinnati. The Koellers' decision not to visit Rachel Kramer does not tend to show anything about their interactions with Barbara Kramer or any effort to try to turn her against Rachel Kramer.

The Daughters make much of Article II of the Trust. The first paragraph of Article II stated that the Settlor could revoke or amend the Trust by delivering a signed instrument to that effect to the Trustee, but no amendment could change the powers, duties, or compensation of the Trustee without the Trustee's written approval. This was a standard paragraph that attorney Albert-Fritz included in revocable living trusts that she drafted. The Daughters have presented no evidence that Koeller overpowered Barbara Kramer's will to have this paragraph included in the Trust.

The Daughters argue that Article II gave Koeller power over the Trust and prevented Barbara Kramer from amending the Trust. This is simply incorrect. Barbara Kramer was the Settlor and Trustee and so could approve any change to the Trust. She could revoke or amend the Trust in any manner at any time. She did not need Koeller's approval.

The Daughters note that the second paragraph of the Trust named Koeller as successor Trustee.  They argue that this provision gave him power over the Trust if he could get Barbara Kramer to resign as Trustee. This is also incorrect.  If Barbara Kramer resigned, she could always revoke the Trust.[8]

Furthermore, the Daughters presented no evidence that Koeller ever tried to persuade Barbara Kramer to resign as Trustee.   If Koeller overpowered Barbara Kramer's will to put Article II into the Trust so he could get her to resign and take control of the Trust, surely he would have tried to get her to resign.  Barbara Kramer, however, remained Trustee for over six years, from October 8, 2012 until November 10, 2018.  The Daughters presented no evidence that Kramer did anything to try to take control of the Trust for those six years.

Rachel Kramer saw the November 10, 2018 resignation as a "red flag" of some sinister plan by Koeller.  Rachel Kramer's feelings and speculations are not evidence of undue influence.  The evidence shows that by November 5, 2018, Barbara Kramer was gravely ill and in the hospital.  Her pulmonologist told both Koeller and Claire Kramer that

---

[8] Attorney Albert-Fritz testified that the first sentence would have limited Barbara Kramer's ability to revoke the Trust.  Albert-Fritz's erroneous interpretation does not change the clear language of the Trust.

Barbara Kramer was terminally ill and would live no more than six months, and her banker asked Koeller to get Barbara Kramer to resign so that someone could sign the checks and pay the bills for Barbara Kramer.[9] Only then did Koeller prepare a Trustee resignation. Preparing a Trustee resignation under these circumstances does not show a desire to overwhelm Barbara Kramer's free will, and certainly does not show any effort to overwhelm Barbara Kramer's free will more than six years earlier when she signed the 2012 Will and Trust.

The Daughters ask the Court to question Koeller's credibility. Both sides correctly note that the Court at summary judgment does not weigh the evidence. The Court draws all reasonable inferences from the evidence in favor of the Daughters as the non-moving parties, but the Court does not weigh the evidence. Anderson, 477 U.S. at 249. Here, the evidence is Koeller's testimony that the pulmonologist said Barbara Kramer was terminally ill, and Kramer's banker asked him to get Barbara Kramer to resign so somebody could sign the checks and pay the bills. The Daughters present no contradictory evidence. Therefore, the uncontradicted evidence shows that Koeller asked Barbara Kramer to

---

[9] Koeller had the power of attorney for Barbara Kramer, but the power would only be effective if Barbara Kramer's doctor declared in writing that she was disabled. Power of Attorney for Property ¶ 6.

resign at the behest of the banker after he knew that his sister was terminally ill.  The banker asked for Barbara Kramer's resignation so a successor Trustee would have authority to write checks and pay Barbara Kramer's bills during her illness.  The resignation does not show undue influence.

The Daughters cited several cases in which Illinois courts found issues of fact regarding whether the defendant exerted undue influence. These cases cited by the Daughters, unlike this case, contain evidence of undue influence concerning the preparation and execution of the will.  In In re Estate of Jessman, the defendant selected the attorney to draft the will, took the decedent to the attorney's office, and was present when the attorney met with the decedent to prepare the will.  Jessman, 197 Ill.App.3d 414, 416, 554 N.E.2d 718, 719 (Ill. App. 5th Dist., 1990).  Here, Koeller did not know attorney Albert-Fritz who Barbara Kramer selected to prepare the 2012 Will and Trust, and Barbara Kramer went alone three times to see attorney Albert-Fritz to prepare and execute the 2012 Will and Trust.

In Hoover, the decedent disinherited his son Robert and left the inheritance his son would have received to his son's ex-wife Nancy and their three daughters.  The son presented evidence at summary judgment that Nancy had written letters to the decedent falsely representing that

Robert abandoned his daughters after the divorce, left Nancy and the

daughters destitute after the divorce, destroyed Robert's relationship with

their daughters, and refused to provide for his daughters' education.

Hoover, 155 Ill.2d 402, 412-13, 615 N.E.2d 736, 740-41.  Here, the

Daughters have presented no evidence that Koeller made any

misrepresentations or disparaging comments to Barbara Kramer regarding

the Daughters.  Rachel stated her belief that Koeller disapproved of her

same sex relationship, but she presented no evidence that Koeller made

any disparaging comments to Barbara Kramer about her.

In Roeseler, the decedent, a widower, was in his 90s when he

changed his will to disinherit his stepdaughter and leave his estate to the

decedent's neighbors.  The stepdaughter presented evidence that the

decedent was senile and lacked testamentary capacity.  The son of one of

these neighbors (Son-Attorney) was the attorney who wrote the first will

that left the estate to his mother and the other neighbor.  A year later, the

Son-Attorney selected another attorney to prepare a second will for the

decedent.  This second will left the decedent's estate to the same

neighbors but, in addition, provided that the Son-Attorney would receive his

mother's share of the estate if his mother predeceased the decedent.  The

lawyer who wrote the second will did not know that the decedent had been

married or had a stepdaughter.  The lawyer who wrote the second will also had a law partner who was a high school friend and college fraternity brother of the Son-Attorney.  Roeseler, 679 N.E.2d at 396-98, 405.  Here, Koeller was not a neighbor, but the only living sibling of Barbara Kramer; Koeller did not know Attorney Albert-Fritz; and Koeller was not involved in the preparation or execution of the 2012 Will and Trust.

The Daughters also cite Letsche v. Gillespie, 73 Ill.App.3d 643, 392 N.E.2d 612 (Ill. App. 3d Dist. 1979).  In Letsche, the Court entered directed verdict at the close of petitioner's evidence at trial, finding that the petitioner failed to present evidence of undue influence.  The Daughters must meet the same standard to overcome the motion for summary judgment.  Anderson, 477 U.S. at 251-52.  The decedent in Letsche was declared incompetent and the respondent was appointed as custodian of the decedent in 1961 or 1962.  The decedent's will at the time left her estate in equal shares to the petitioner and respondent.  In 1964, the decedent moved into a home for the elderly.  Twelve years later, in 1976, the attorney representing the respondent conservator directed the decedent to write out what she wanted in her will.  The decedent wrote a letter.  The decedent gave the letter to the respondent, and the respondent read the letter to the attorney over the telephone.  The letter said the decedent

wanted to give one-third of her estate to petitioner and two-thirds to respondent.  The respondent testified that she was not involved in the writing of the letter.  The attorney drafted the will accordingly.  The respondent was at the home for the elderly when the decedent executed the will, but she was not in the room.   The respondent met with the decedent shortly after she executed the will.  The decedent gave the will to the respondent for safe keeping.  Letsche, 392 N.E.2d at 613.  The Court entered directed verdict because this evidence was not sufficient to show that the defendant participated in the procuring of the will.  Id., at 614.

The Court in Jessman, 554 N.E.2d 718 at 420, noted that to create a presumption of undue influence the plaintiff must show the will was prepared or procured and executed in circumstances in which the questioned beneficiary was instrumental or participated.  No such evidence is presented in this case.

Here, Koeller was far less involved.  Koeller recommended to Barbara Kramer to establish a revocable living trust, but he had no connection with the lawyer that prepared the trust, did not know Barbara Kramer's plan for distributing her estate, and was not involved in the preparation of the 2012 Will and the Trust.  The facts supporting undue influence in In re Estate of Jessman, Hoover, and Roeseler cases are

absent in this case.  Likewise, the evidence of undue influence in <u>Letsche</u> was much stronger than the evidence in this case, but was deemed not to support the plaintiff's claim of undue influence.  Based on the lack of evidence of undue influence in the procurement and execution of the Will in this case, the cases cited above support the conclusion Koeller is entitled to summary judgment in this case.

<u>Counterclaim I</u>

Koeller seeks summary judgment on his claim that Rachel Kramer violated the Illinois Disposition of Remains Act (Act), 755 ILCS 65/1 et seq., when she took Barbara Kramer's remains to her home in Cincinnati, Ohio. The Act sets the order of priority to identify the person entitled to determine the disposition on remains.  The Act authorizes a cause of action when a dispute exists over the right to control the disposition of remains:

> § 50. Disputes. Any dispute among any of the persons listed in Section 5 concerning their right to control the disposition, including cremation, of a decedent's remains shall be resolved by a court of competent jurisdiction within 30 days of the dispute being filed with the court. A cemetery organization or funeral establishment shall not be liable for refusing to accept the decedent's remains, or to inter or otherwise dispose of the decedent's remains, until it receives a court order or other suitable confirmation that the dispute has been resolved or settled.

755 ILCS 65/50.

The Daughters have presented evidence showing that an issue of fact exists regarding whether a dispute exists regarding Koeller's right to control the disposition of Barbara Kramer's remains.  Koeller as the Personal Representative of the estate in this case had priority to control the disposition of Barbara Kramer's remains.  755 ILCS 65/5.  Barbara Kramer died in November 2018, and the memorial service was in December 2018. Rachel Kramer testified that she consulted with Koeller after the memorial service about the disposition of the remains.  According to Rachel Kramer, they agreed that Decedent's remains would be buried in the spring when the weather was warmer in Barry, Illinois, next to her parents' graves.  For purposes of summary judgment, the Court must credit this testimony. Rachel Kramer did not dispute Koeller's authority; rather, she discussed the matter with Koeller and received his consent to the plan for the disposition of the remains.  Rachel Kramer took the remains to her home after the memorial service in December until they could be buried in the spring.  This case has, evidently, delayed the burial; still, the evidence does not show a dispute about his authority to decide on the disposition of the remains. Koeller, therefore, is not entitled to summary judgment under the Act.

THEREFORE, IT IS ORDERED that Respondent Robert M. Koeller's Motion for Summary Judgment (d/e 67) is ALLOWED in part and DENIED

in part.  The Court enters summary judgment in favor of Respondent and against Petitioners on Petitioner's claims.  The Court denies summary judgment on Respondent's Counterclaim I.  The matter will proceed to trial as scheduled on Respondent's counterclaims.

ENTER:   September 9, 2021

_____s/ *Tom Schanzle-Haskins*_____
TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE